## THE WILLAMETTE VALLEY.

### GLEASON v. THE WILLAMETTE VALLEY.

(District Court, N. D. California. January 7, 1896.)

#### No. 10,777.

1. ADMIRALTY—JURISDICTION—MARINE TORT.

Libelant purchased from a ticket broker the return coupon of a first-class excursion ticket from San Francisco to Albany, Or., and return, such coupon bearing on its face no prohibition of transfer, and entitling the holder to travel, partly by rail and partly by steamer, to San Francisco. The ticket was accepted, without objection, for libelant's passage over the railroad, and he went on board the steamer, showed his ticket, was assigned a berth, and enjoyed the privileges of a first-class passenger until the middle of the following day, when the purser of the steamer informed him that his ticket would not be accepted, and refused longer to furnish him accommodations, unless he paid the full fare to San Francisco. Libelant refused, but offered to compromise by paying for a steerage passage. This the purser refused to allow him to do, and publicly ordered the steerage steward not to furnish him food or accommodations. First-class accommodations were offered him, if he would pay for them, but libelant, declining to do so, was obliged to pass the night and part of a day, without food or bed, in an exposed part of the steamer, in cold and foggy weather. *Held*, that libelant was entitled to be conveyed to San Francisco as a first-class passenger, without paying additional fare, and the refusal of the officers of the vessel to give him such accommodations was a marine tort, for which libelant might proceed, in admiralty, against the vessel, without regard to any question of the jurisdiction of admiralty over the contract for land and water transportation under which he had been taken on board.

2. CARRIERS OF PASSENGERS—DUTY TO FURNISH ACCOMMODATIONS.

*Held*, further, that neither the fact of libelant's enjoying first-class accommodations for a part of the voyage, before any objection was made to his doing so, nor his subsequent failure to accept such accommodations, when tendered to him on condition of his paying fare, affected his right to recover for the tort of the vessel's officers.

3. SAME—DAMAGES.

*Held*, further, it appearing that libelant had been subjected to annoyance and some public humiliation, with great discomfort, but had suffered no serious physical injury, that $300 was a proper allowance as damages.

Libel in rem for damages sustained while a passenger on board the Willamette Valley, the Oregon Pacific Railroad Company (Charles Clark, receiver), claimant. Decree for libelant in the sum of $300.

John A. McKenna, for libelant.

Wal. J. Tuska and Page, Eells & Wheeler, for claimant and receiver.

MORROW, District Judge. The libel in rem is filed to recover the sum of $5,000 for damages alleged to have been sustained by libelant, while a passenger on board of the steamship Willamette Valley, on a voyage from Yaquina Bay, Or., to San Francisco. Libelant alleges that, after he had been received on board the vessel, he was refused first-class accommodations, to which, he claims, his ticket

entitled him, and that he was not permitted to occupy a steerage passage, although he offered to pay for the same; that he was excluded from the cabin and steerage of the vessel, kept and confined upon the forward part of the main deck, and refused and deprived of lodgings, sleeping accommodations, and provisions as a cabin or steerage passenger from the second day of the voyage, August 5, 1893, to its termination on the day following, August 6, 1893; that, by reason of these deprivations and ill treatment, his health has been impaired, and he was subjected to shame, humiliation, and indignity, by being excluded from his rights as a passenger, and he has suffered great physical pain and mental distress, to his damage in the sum above mentioned. A general denial was interposed on behalf of the claimants of the vessel.

The case rests almost exclusively upon the testimony of the libelant, on the one hand, and of the purser of the vessel, with whom libelant had all his dealings, on the other hand. There is but little conflict between these two witnesses as to the salient facts. It appears that Gleason, being in the state of Oregon and desirous of coming to San Francisco, purchased at Portland from a ticket broker a ticket which purported on its face to be good for a return trip from Albany to San Francisco, and was represented to libelant as entitling him to a first-class passage, consisting of a stateroom and meals at the cabin table. He paid $4.50 for it. The ticket was the return coupon of a round-trip excursion ticket from San Francisco to Albany and return, and entitled the holder to a first-class passage. It had been sold originally in San Francisco to one Charles Meyers and used by him or some other person from that place to Albany, and thereafter had been disposed of to the broker in Portland, who, in turn, sold it to the libelant as good for the return trip to San Francisco. The ticket was introduced at the hearing. It had nothing upon it to indicate that it was not transferable. At the conclusion of libelant's case, a motion for a nonsuit was made by the claimant, on the ground that the libelant had no right to travel on an excursion ticket—that is, on the return coupon—which had originally belonged to some one else. But this objection was overruled, and the motion denied, for the reason that there was nothing on the face of the return coupon to indicate that it was not transferable, and that, therefore, the libelant had the right to use it and receive transportation and first-class accommodations therefor. Carsten v. Railroad Co. (Minn.) 47 N. W. 49; Hoffman v. Railroad Co. (Minn.) 47 N. W. 312; Nichols v. Southern Pac. Co. (Or.) 31 Pac. 296. Libelant reached Albany by rail, for which part of the transportation he had, however, to pay an additional fare. From Albany he had to travel by rail to Yaquina Bay, where the steamer was lying. This part of the journey was covered by the ticket he held. The distance between these two places is about 90 miles. That between the latter place and San Francisco, the port of destination, is about 450 miles.

It was urged upon the argument, as an objection to the jurisdiction of the court, that, as part of the transportation had been on land,

this fact operated to divest the court, as a court of admiralty, of whatever jurisdiction it otherwise had of the case. In other words, it was claimed that the subject of the maritime service must be "wholly of admiralty cognizance"; citing The Pacific, 1 Blatchf. 585, Fed. Cas. No. 10,643, and other cases. Whether an incidental land carriage, in connection with a transportation upon the high seas, can be deemed to divest a court of admiralty of its jurisdiction over the maritime part of the contract for such service, it is not necessary, under the pleadings of this case, to decide. The objection is immaterial, for the simple reason that the libelant is not suing upon the contract of transportation, but he seeks to recover for alleged tortious acts committed by the master and his agents upon the vessel on the high seas, and not for anything that took place on land. So that it cannot be said that this case presents the question of divided jurisdiction. As locality is the sole test of admiralty jurisdiction over torts, the allegations and facts certainly bring this case within that rule.

But it is argued that libelant was on the vessel solely by virtue of the contractual relations that purported to exist between the carrier and himself, which contract included the 90 miles of land transportation from Albany to Yaquina Bay. While this is undoubtedly true, yet it does not alter the tortious character of the acts complained of as having been inflicted on the libelant by the master and his agents. The libelant, unquestionably, was on board the vessel by virtue of some right or color of right. His contract of passengership lies at the basis of this suit, but that fact does not impair his right to sue in a court of admiralty for any maritime tort that may have been inflicted upon him, and to do this he need not sue on the contract itself. The cases cited by counsel for claimant in no wise controvert this proposition, nor can they be said to sustain the contention he seeks to establish. The Pacific, supra, and Plummer v. Webb, 4 Mason, 384, Fed. Cas. No. 11,233, were suits for breach of contract,—one of passengership, and the latter of apprenticeship,—and not for torts arising from breaches of such contracts. They did not involve the fact of any land transportation. In the case of The Moses Taylor, 4 Wall. 411, one Hammons entered into a contract with Roberts, as owner of the steamship, for transportation from New York to San Francisco, as a steerage passenger, with reasonable dispatch, and to furnish him with proper and necessary accommodations on the voyage. For alleged breach of this contract Hammons brought an action, under a law of the state of California, against the vessel in the justice's court in San Francisco. The breach alleged was that the plaintiff was detained at the Isthmus of Panama eight days, and that the provisions furnished him on the voyage were unwholesome, and that he was crowded into an unhealthy cabin, without sufficient room or air for either health or comfort, in consequence of a large number of steerage passengers, more than the vessel was allowed by law to have, or could properly carry. The agent of the vessel filed an answer in which he denied the allegations of the complaint, and asserted that the court had no

jurisdiction, because the cause of action, as against the said vessel, was one of which the courts of admiralty had exclusive jurisdiction. The justice decided that he had jurisdiction, and gave judgment for the plaintiff. The case was taken to the county court, where the objection to the jurisdiction was again made and again overruled, and, final judgment being entered in favor of the plaintiff, the case was taken to the supreme court of the United States on a writ of error. In the supreme court it was contended, in favor of the jurisdiction of the state court, among other things, that, as the land carriage at the isthmus was a substantial part of the voyage, the jurisdiction of the admiralty court did not attach, for the reason that a contract, to come within that jurisdiction, "must be wholly of admiralty cognizance, or else it was not at all within it"; citing the case of The Pacific, supra. The supreme court held that the case presented was clearly one within the admiralty and maritime jurisdiction of the federal courts, and that the state court had no jurisdiction of the case in a proceeding in rem. Clearly, the court did not consider the incidental land transportation at the isthmus, or the breach of contract involved in the detention of the plaintiff on land, as impairing the admiralty jurisdiction over that part of the contract relating exclusively to a service to be performed on the high seas, and pertaining solely to the business of commerce and navigation. I am of the opinion, therefore, that the mere fact that the contract of transportation in this case included also an incidental land carriage in no way impairs the right of the libelant to sue in admiralty for the alleged commission of a maritime tort on the high seas.

From the testimony, it appears that Gleason boarded the steamer at Yaquina on August 4, 1893. The vessel left about 4 o'clock p. m. of that day. Previous to her departure, Gleason deposited with the purser, for safe-keeping, the sum of $240, for which he received a receipt. About an hour after leaving port, he presented himself, along with other passengers, at the purser's office, for the purpose of securing the number of his berth. He presented his ticket to the purser. who, according to libelant's testimony, handed it back to him without assigning any reason therefor. The purser testified that he then and there told Gleason that he had no right to the ticket,—no right to a passage on it; but in his cross-examination he was unwilling to swear positively that he did speak at all to Gleason on the subject upon that occasion. I am inclined to think that the libelant's version in this respect is more consistent with the true state of facts. On his ticket being returned to him, as stated, the libelant repaired to the cabin and had his dinner. Subsequently, and at a rather late hour of the evening, the purser came into the smoking room and assigned rooms to the passengers who were there. He informed the libelant that his room was No. 6. No intimation was then given to Gleason that his right to travel as a first-class passenger would be disputed, and that he would be called upon to pay for the passage down on the steamer. Gleason occupied his stateroom that night, and had breakfast the following morning at the cabin

table. Between 12 and 1 o'clock of that day, August 5, 1893, while he was waiting to go into dinner, the purser approached him, and, according to the latter's testimony, asked the libelant, in the presence of several passengers, if he knew that he was traveling on another man's ticket. The libelant replied that he had purchased the ticket, and was traveling on it as his own. The purser accused him of not being the original owner, to which libelant replied: "I am the owner of this ticket, for I bought it." They had some words, and the purser invited libelant to his private room, where they further discussed the matter. The purser testified that, unwilling to create a scene, he had invited Gleason into his private room before even broaching the subject to him, and that he does not believe that anybody was around while the discussion was going on. Aside from this conflict as to whether libelant's right to travel on the ticket he held was disputed before his fellow-passengers, to his shame and humiliation, as he claims, the substance of what passed between them is free from difficulty. The purser insisted that the libelant had no right to travel on the ticket he held, and that he must pay $12, the full fare for the passage on the steamer from Yaquina to San Francisco. The libelant as stoutly maintained his right to travel on the ticket, and positively declined to pay any additional fare for a first-class passage. The discussion appears to have become animated, both parties using strong language. Each side claims that the abuse emanated from the other, and, perhaps, it is safe to say that each of these gentlemen considered that he was in the right, and resented vehemently any imputation to the contrary. The purser admits that he lost his temper. But, up to this time, whatever abuse may have been heaped on the libelant, or whatever shame and humiliation he may have suffered by reason of the publicity which, he says, the purser gave to this affair, his damages are too indefinite to entitle him to any substantial pecuniary relief. If the case stopped here, no recovery could be had. It is with respect to what follows that libelant's recovery must, to a large extent, be based. The purser, finding that the libelant remained obdurate in declining to pay the fare of $12, and recalling that he held $240 belonging to libelant, threatened to take $12 out of this sum. Gleason denied his right to do this, but offered to compromise by surrendering the ticket he held and paying for and occupying a steerage passage. The fare in the steerage was $8. The purser refused to accede to this proposition, for the reason, as he states, that Gleason had already occupied the cabin for one night, and had had meals at the cabin table. The culmination of the controversy is, perhaps, best explained by the purser. He stated:

"We argued some time. I finally told him what my ultimatum was,—that he must pay me $12, cabin passage from Yaquina to San Francisco. He insisted he would not; that he would go in the steerage. I told him I would not allow him in the steerage. After a few very bitter words on Mr. Gleason's part,—whether or not I returned the compliment I cannot say, —he rushed below to the steerage. I went below to the steerage myself, and informed the steward there he was not to give Mr. Gleason steerage fare. I had a very excellent reason for so doing. It was not a question of spite, but of law, with me. The ship was allowed a certain number of

steerage passengers. The roster was entirely full. There was no more room for any steerage passengers, and had Mr. Gleason—whom I had come to consider a sort of steerage lawyer—been allowed to take steerage passage, or I had sanctioned it, I felt he had a much better cause against the company than I though he might be looking for, and I forbade the steerage steward giving him any accommodations."

This injunction to the steward was given in the presence of several steerage passengers and in an angry tone. The reason given by the purser for not permitting the libelant to pay for and occupy steerage quarters, viz. that the vessel was only allowed to carry a certain number of steerage passengers, and that she had all of that number at the time, does not comport with the true state of facts. The evidence shows that there were only 12 steerage passengers on board, and a duly authenticated copy of the certificate of inspection, provided for by section 4423, Rev. St. U. S., introduced at the hearing, shows that the steamer Willamette Valley was authorized by the supervising inspectors, on June 19, 1893, to carry as many as 50 steerage passengers. The reason which the purser now tenders is therefore devoid of merit. The real reason would seem to be that he considered that, as the libelant had already occupied the cabin one night, and had had two meals as a first-class passenger, he should continue as such, and pay full fare. But in this he was certainly in error. The libelant had a perfect right to travel as a steerage passenger, if he so desired, in preference to paying another fare for a first-class passage, and the purser acted unjustifiably in refusing to permit him to do so, and aggravated the breach by peremptorily directing the steerage steward not to provide libelant with any steerage accommodations. Nor had he any right to compel the libelant to use first-class quarters and accommodations, by the continued threat to deduct the fare from the money he had received from libelant for safe-keeping. Gleason's offer to pay for a steerage passage impresses me as perfectly fair, and, under the circumstances, should have been accepted by the purser. He had a right to travel on the ticket which was rejected, without having to pay any additional fare. He was, therefore, certainly under no legal obligation to pay for a steerage passage, and his offer to compromise on such terms was a reasonable settlement of the pending controversy.

The fact that libelant refused to avail himself of the accommodations of a first-class passage, although the same were repeatedly offered to him, because he thought he might lay himself liable to a second payment for such first-class passage, cannot be deemed to affect his legal rights as a first-class passenger, nor impair his remedy for any tortious conduct growing out of the violation of such rights. That his fear in that direction was not fanciful nor imaginary, but real and justifiable, is abundantly established by the admissions of the purser himself. If Gleason had the right to travel on the ticket he held as a first-class passenger, he had the right to do so without being compelled to pay any additional fare. As was said in Railroad Co. v. Dennis, 4 Tex. Civ. App. 90, 23 S. W. 400:

"A passenger is under no obligation, to avoid expulsion from the train, to pay the extra fare demanded, and sue to recover it back."

The course pursued by the purser, therefore, in repeatedly tendering the libelant his first-class accommodations, and declining to permit him to enjoy any other, does not alter the legal status of the case, coupled, as it was, with the condition that he would have to pay the passage money a second time.   Nor does the fact that libelant occupied his stateroom for one night and had two meals at the cabin table furnish any ground, legal or equitable, for the course pursued by the purser, or affect libelant's right to recover for the subsequent tortious conduct.   Gleason, I am satisfied from the testimony, had no intimation that his right to travel on the ticket he held would be disputed.   A circumstance, which is significant as bearing out the fact that he was taken unawares, is that he used it from Albany to Yaquina Bay, and it does not appear that the conductor of the train took any exception to his ownership or right to use it.   He was not notified by the purser that his ticket would not be recognized until the second day out, as has been previously stated.   He was therefore acting entirely in the dark, and his actions in that respect cannot be made to militate against him or otherwise prejudice his rights.   As soon as he did learn that his ticket would not be accepted, and that he was required to pay for his passage, he positively declined to partake further of any first-class accommodations.

It remains to be seen whether libelant suffered any real damage, and, if so, to what extent.   The mere refusal to recognize his rights, either as a first-class or as a steerage passenger, is undoubtedly actionable.   As was well said in the case of Railroad Co. v. Winter's Adm'r, 143 U. S. 73, 12 Sup. Ct. 356:

"The fact that, under such circumstances, he was put off the train, was of itself a good cause of action against the company, irrespective of any physical injury he may have received at that time, or which was caused thereby."

Unable to occupy steerage quarters, and determined not to continue as a first-class passenger under the conditions imposed, the libelant repaired to the forward part of the main deck, and remained there until late at night.   This place is described by him as being uninclosed, and exposed to the cold and fog.   There was considerable freight, consisting principally of cord wood, and quite a number of coops containing chickens.   There was no convenient place to rest, and he was not permitted to make himself comfortable.   He testified that some of the steerage passengers invited him to join in a game of cards, and that he made an effort to obtain a stool, but he was compelled to give it up, and was abused by a person connected with the vessel, and, by reason of his not being able to get a seat, had to give up the game.   At supper time, he was notified that his meal at the cabin table was ready for him, but he declined to go, unless his ticket was accepted.   At a later hour, he was notified that his berth was ready, but he again refused under the conditions imposed.   He could obtain nothing from the steerage, by reason of the instruction of the purser, and, therefore, had to go without anything to eat.   It will also be remembered that he had not had

any lunch. The weather on that night was rather foggy, damp, and cold, and spray would come occasionally through the open ports. He stayed there until about 11 o'clock at night, and then sought more comfortable quarters in the lower part of the hold. This place was infested with rats, and was cold. He sat down on some bales of leather, and made himself as comfortable as he could. About 2 or 3 o'clock of the following morning, he became so chilled that he was compelled to move around. He went to the upper deck and walked for a while, and then bethought himself of the smoking and card room. He went in there, occupied a seat, and slept for a couple of hours, when he was forced to vacate by reason of the fact that some one came in to clean up the room. This was about 5 o'clock on Sunday morning. He thereupon went on the main deck, where he remained for some time. About 6 or 7 o'clock he went to the purser and demanded the return of his money. The latter refused to give up the full $240 unless Gleason would pay for a first-class passage. The vessel, it seems, was due in San Francisco that morning, and was, in fact, at that time but a few miles outside the Heads. Gleason went to the steerage, and induced two of the steerage passengers to go with him to the purser, but the latter cut matters short by directing the latter to leave, giving as his reason that only cabin passengers were allowed there. Gleason then requested a cabin passenger to go with him, and witness the fact that he had asked for his money and presented his receipt therefor. In the presence of this gentleman he again demanded the return of his money, but the purser declined to give it up unless he would consent to pay for a first-class passage down. This Gleason positively refused to do, and the purser then stated that he would turn the money over to the agent in San Francisco, and that the libelant would have to settle with that person. Shortly after this episode, the vessel arrived at San Francisco. The money was turned over to the agent there, and after several efforts and some interviews with that official, the libelant finally succeeded in having the $240 returned to him in full on the following Tuesday.

From this narration of the facts, it is evident that the libelant, although entitled to damages, has not been very greatly injured. It is true that he was put to considerable inconvenience and endured some hardship in having to pass the night without a comfortable berth, and undoubtedly suffered from the want of his regular meals. But, it is to be observed, these privations were to a certain extent self-inflicted. He could have occupied first-class accommodations under protest. But this does not seem to have been suggested, nor did it occur to him. Still, his attitude in this regard cannot be said to debar him from any recovery, in view of the imperative condition imposed that he should pay a second time for the passage, when, as a matter of law and right, the ticket he held and presented entitled him to a first-class passage. But the undisputed fact remains that, although he offered to pay therefor, he was denied any food or accommodations as a steerage passenger, and for such damage as he may have suffered therefrom he is certainly entitled to

recover. The position in which he was placed was undoubtedly unpleasant, and one which carried with it a sense of mortification and shame. The contumely to which he was subjected and the indignities he endured were certainly uncalled for, and aggravate the whole affair. 1 Wood, Mayne, Dam. p. 74, note. Whatever may be the mental distress he suffered, he does not appear to have sustained any particular physical injury. He claims to have contracted a severe cold, from the effects of which he afterwards suffered considerably,—to such an extent that he claims he was compelled to give up some employment he had obtained at the Midwinter Fair, and had to make application to a society in Tacoma, of which he was a member, for sick dues. He says he contracted a bad cough, and was otherwise physically distressed; but although he testifies that he visited a doctor, and took some medicine on his advice, yet that person was not called to substantiate his statements in that regard. I am rather inclined to believe that he was suffering from nothing more than a very bad cold, contracted on the night he was without accommodations. It may be observed, however, that the libelant had been a member of the police force in Tacoma for a period of some three years, and that, as such, to use his own language, he "was out steady every night for a whole year * * * on the night patrol." He must have been, therefore, somewhat accustomed and inured to cold and damp nights, and although, under the circumstances of this case, his exposure to the foggy and damp weather was a hardship, yet it was not as great a hardship to him as it would have been to a frail and delicate person. Aside from his mental distress, the actual damage may be summed up thus: He had to pass the night without any accommodations whatever, exposed to the inclemency of the weather, by reason of which he suffered inconvenience and hardship, and contracted a severe cold, and he was not given anything to eat for nearly 24 hours. Taking all the facts of the case into consideration, I think that $300 is a fair recompense for the damage he has sustained, and a decree in that amount, with costs, will be entered.