Beatrice Shainswit, J.
This is an action for breach of contract, in connection with a transatlantic pleasure cruise which turned into a nightmare. The plaintiff seeks to recover the moneys which were paid for first class passage for himself and his wife aboard the S. S. Cristoforo Colombo.
It is conceded that the plaintiff may sue also on behalf of his wife. The defendant has further waived, and wisely so, any attempt to rely on those sections of the microscopic provisions in the contract (about which much more will be said later) providing that plaintiff must establish his grievance in conformity with the laws of Italy, and, indeed, that he must sue in Genoa, and in Genoa alone.
With this underbrush cleared away, the tale of passengers in the grip of a calloused and indifferent line, putting money above duty, can now unfold.
Beguiled by a brochure heralding “ The Mediterranean 1971 Sailings * * * Italian Line’s Ocean Travel — A New Touch in Class and Luxury ” aboard the defendant’s “ Fun Ship,” plaintiff purchased first-class passage on the Cristoforo Colombo for a transatlantic crossing for himself and his wife, at a cost of $1,456. The unique appeal was that, unlike the customary crossing, plaintiff could enjoy a 13-day pleasure cruise, leaving *721 New York on August 4,1971, with scheduled stops of from three to seven hours in no less than seven Mediterranean ports in Portugal, Spain, Greece and Italy, prior to disembarkation in Trieste on August 17.
Plaintiff’s expectations, and indeed the very core of the bargained-for passage, were soon shattered. On August 10, a few hours before reaching the first stop, Lisbon, the Colombo, moving in a dense fog, collided with another ship, the Ana Mafalda. The parties are in direct dispute as to whether the Colombo’s negligence was responsible for the accident. In any event, the result was the effectual cancellation of the entire Mediterranean itinerary, though only 5 of the scheduled 13 days of the cruise had elapsed. The Colombo spent 3 days in Lisbon undergoing repairs and did not set sail again until August 13. The ship then made a brief nighttime stop at Palermo, and at 10:00 a.m. on August 16 proceeded to discharge all passengers in Naples.
Recognizing its responsibility at least to deliver its passengers to the scheduled termination port of Trieste, the defendant thereupon proceeded to carry out that responsibility in a fashion warranting detailed description. The accident had occurred on August 10, and passengers had been told on August 13 of the plans to discharge them at Naples. Plaintiff and his wife had received tickets for rail passage from Naples on to Trieste, and had been orally assured that they were entitled to, and would receive, first-class treatment.
Nevertheless, at 10:00 a.m. on August 16 — after the Italian Line had had six full days to make preparations — the more than 150 first-class passengers were taken off the air-conditioned ship (which remained in port until after 5:00 p.m.) to a third-class hotel in Naples, where no rooms were made available to them, but only a small lobby with seats for no more than 30 people. The hotel was not air-conditioned, and the outside temperature was nearly 90 degrees.
At 9:00 p.m. the passengers were taken by bus to the railroad station. There all of the first-class passengers were ordered, by an Italian Line employee, into compartments in three third-class railway sleeper cars — which are the most inferior type of sleeping cars in use in Italy. Each car consisted of 50 compartments and each compartment contained two vertical tiers of three narrow shelves each. There was no bedding provided except a single sheet, no ladders or footholds for climbing to the upper shelves, no individual plumbing and, of course, no air-conditioning. Plaintiff and his wife were compelled to share a *722 compartment with two other men and two other women. There were insufficient shelves, and some of the first-class passengers stood up all night. Each car, holding more than 50 people, contained just three tiny lavatories. Plaintiff and his wife were obliged to remain in their same attire throughout because of the communal living arrangement into which they were thrown, and because their baggage was piled with all the rest in a separate car, without any prior warning to them. The train, which left Naples at 10:50 p.m. and arrived in Trieste at 11:00 a.m., contained no dining car, and no food was provided at any time.
In contrast to the facilities dealt to plaintiff, the service crew of the Cristoforo Colombo secured for themselves markedly superior accommodations on the very same train. Apparently responding to its own code of the sea, defendant made no effort to achieve for plaintiff what the service crew had achieved for themselves.
Defendant, in essence, denies none of these facts. Its entire formal case consisted of proffering an inconsequential self-serving deposition by a junior deck officer, designed to prove that the Ana Mafalda and not the Cristoforo Colombo was responsible for the collision. The court notes merely that, even if that were so, it would not absolve defendant from responsibility for its own actions subsequent to the collision, when defendant unilaterally controlled plaintiff’s destiny.
We turn, therefore, against this factual background, to the controlling legal principles, which speak with telling effect.
First:
The itinerary of the crossing from New York to Trieste (which was left wholly undescribed in the ticket) can, of course, be derived from the brochure that triggered plaintiff’s entry into the contract of passage. It is unnecessary to cite the legion of cases holding that omitted specifics of an undefined contract can be derived from contemporaneous writings and representations ; defendant itself does not dispute the scope of the intended voyage, nor the ports of call that were to be an integral part of the transatlantic crossing.
In failing to transport plaintiff and his wife to 4 of the 8 scheduled European ports, and in foreshortening the number of days at sea, defendant substantially breached the contract of passage.
Second:
The decisional law also makes crystal clear that the shabby treatment accorded plaintiff after the Cristoforo Colombo docked at Naples not only compounded the breach already referred to, *723 but was itself independently actionable. First-class passage means precisely that, and it most certainly was not provided to plaintiff.
Typical is Lignante v. Panama R. R. Co. (147 App. Div. 97), where plaintiff’s husband had brought her a first-class steamship ticket. In finding for plaintiff, the court held (p. 99) that: “ The contract in question called for a first-class carriage of the passenger. Carriage of such class implied that the accommodations furnished would be consistent with ordinary decency” and that housing her in a stateroom along with a strange woman and her 14-year-old son did not accord with such decency.
In Sparks v. The Sonora (22 Fed. Cas. 883, 884-886 [D. C. Cal. 1859]), the court noted that, especially where the passenger has “ paid the highest price ”: “ The passenger’s contract must be construed to embrace a stipulation for such accommodations as are necessary to a reasonable degree of comfort.”
In accord:
Gleason v. The Williamette Valley (71 F. 712 [D. C. Cal.,, 1896]); Aplington v. Pullman Co. (110 App. Div. 250); Larsen v. Allan Line S. S. Co. (37 Wash. 555).
Indeed, the law has evolved a liberal rule of damages where a passenger has been subjected to humiliating indifference and has been accorded treatment inferior to the class of treatment that he had bargained for. Thus, as early as The Valencia (110 F. 221 [D. C. Wash., 1901]) the rule was invoked that where a shipowner fails to fully perform, the passenger may recover, within the discretion of the trier of facts, so much or all of the passage money necessary for rendition of exact justice. (Cf. 80 C. J. S. Shipping, § 202, citing Brown v. Harris, 2 Gray [68 Mass.] 359.)
Other eases carry the bounds of recovery even further. For instance, Lignante v. Panama R. R. Co. (147 App. Div. 97, 99-100, supra) held that ‘ ‘ damages arising from a breach of the contract to carry, which results in inconvenience and indignity to the passenger while in transit, are not limited to the price of passage.”
Equally applicable is Campbell v. Pullman Co. (182 App. Div. 931), holding that the discomfort and inconvenience to which a passenger is put by the breach of a carrier’s contract is within the contemplation of the parties and a proper element of damages.
Third:
Defendant urges that the court is powerless to afford plaintiff any relief because of the existence of so-called 1 ‘ terms and *724 conditions ” embedded in the ticket booklet furnished plaintiff. Defendant’s position is graceless, and without merit on the facts and on the law. It ignores the following cardinal features:
At the threshold, turning to the actual passenger ticket, even the court itself found difficulty in ascertaining the existence of any reference to the “terms and conditions.” .At the risk of considerable eyestrain, the court finally detected that, under a sentence in microscopic Italian script, there is a parallel, virtually unreadable, collation of English words, which appears to state: “ Subject to the conditions printed on the cover of this ticket which form part of this contract.”
This reference is so tucked away, so camouflaged by the surrounding Italian text, and so miniscule in presentation that it is literally a trap for the unwary. There is no legend, in contrast to the legends utilized on every other segment of the ticket, calling attention to its existence. It can only be located, after the most diligent search, if one knows beforehand that it actually exists.
And, when one turns to the 1 ‘ terms and conditions ’ ’ which defendant seeks to integrate into the contract of passage, the strain of detection is further increased. Fully 35 ‘ ‘ terms and conditions ” are squeezed into the booklet, in the smallest type imaginable, so as to render their provisions almost unreadable. These “terms and conditions” presumably are designed to relieve defendant of liability, and to place the passenger at the mercy of the line.
In a nutshell, defendant urges that the court is bound (a) by the covert statement on the face of the ticket, and (b) by the virtually indecipherable ‘ ‘ terms and conditions ’ ’ that that statement springs upon plaintiff.
Justice is not that easily handcuffed. Patently, the contract of passage is a contract of adhesion. And vis-á-vis such a contract, the law frowns upon any effort, by a carrier such as defendant, to expose a passenger to risks and detriments without fair notice or fair play.
This is not the first time that defendant has been judicially called to task because of the format of its ticket. One would have expected that it would have mended its ways after the firm rebuke by (now Chief) Judge Friendly in Silvestri v. Italia Societa Per Azioni Di Navigazione (388 F. 2d 11 [C. A. 2d, 1968]). The ticket involved there was the precise counterpart of the one in the case at bar. In condemning the Italian Line, and the contention that its model of unreadability could be palmed off as a valid incorporation by reference, Judge *725 Friendly emphasized, after marshalling the solid body of precedents (388 F. 2d at 17): ‘ ‘ However, the thread that runs implicitly through the cases sustaining incorporation is that the steamship line had done all it reasonably could to warn the passenger that the terms and conditions were important matters of contract affecting his legal rights. * * *
“ How far the Italian Line’s ticket alleged to effect incorporation fell below what could reasonably have been expected is sufficiently shown by contrasting it with the forms used by other steamship companies ”.
I make the same finding as the Silvestri court. The Italian Line had done virtually nothing at all to warn the passenger of “ terms and conditions ” that made his rights under the contract of passage an illusion.
The Silvestri decision was, of course, foreshadowed, and indeed controlled, by the classic decision of the United States Supreme Court in The Majestic (166 U. S. 375). There the contract ticket had attached to it a “ notice to passengers,” printed in fine type, that the contract was made subject to certain “ conditions.” No realistic attempt was made by the company to call the passenger’s attention to these conditions (even though the words “ see back ” were printed at the foot of the ticket). The Supreme Court, in holding that the conditions did not constitute a part of the contract, adopted the view that “ when a company desires to impose special and most stringent terms upon its customers, in exoneration of its own liability, there is nothing unreasonable in requiring that those terms shall be distinctly declared and deliberately accepted.” (p. 386).
I repeat Judge Friendly’s directive to the Italian Line in Silvestri:11 While we would not insist on any particular rubric, seventy years of experience under The Majestic doctrine should have enabled the draftsman of the ticket to produce a warning significantly more eye-catching than this.” (pp. 17-18).
If more need be said, we have the .recent teaching of the airline cases. The courts have consistently rejected the efforts of defendant carriers to limit the extent of their liability in accordance with the Warsaw Convention, where defendants have resorted to exceedingly fine print. (Egan v. Kollsman Instrument Corp., 21 N Y 2d 160 [1967], cert. den. 390 U. S. 1039; Lisi v. Alitalia — Linee Aeree Italiane, 253 F. Supp. 237, affd. 370 F. 2d 508 [2d Cir., 1966], affd. 390 U. S. 455 [1968]; Bergman v. Pan American World Airways, 32 A D 2d 95 [1st Dept., 1969] ; Stolk v. Compagnie Nationale Air France, 58 Misc 2d 1008 [Civ. *726 Ct., 1969]; and Sofranski v. KLM Royal Dutch Airlines, 68 Misc 2d 402 [Civ. Ct., 1971].)
To recapitulate: Our case involves a defective format of incorporation by reference, and a defective format of the terms and conditions. Even if the incorporation by reference were proper, which it is not, the unfair, and virtually unreadable, type .size of the terms and conditions themselves frustrate defendant’s reliance thereon. (Egan v. Kollsman Instrument Corp., supra, and its progeny.) And see also, with precise applicability to attempts to erase liability by resort to disclaimers in miniscule type, the line of cases exemplified by Blossom v. Dodd (43 N. Y. 264 [1870]).
In sum: Plaintiff’s rights are clear. That he was damaged is clear. That defendant cannot be exonerated from liability is clear. Upon the record as a whole, I find and determine that plaintiff has been damaged in the sum of $500. The sum so awarded represents approximately one third of the total price of passage. This modest recovery makes more than due allowance for what defendant actually supplied, and, indeed, affords defendant a dispensation which the court would be warranted in withholding.
All motions on which the court reserved are disposed of in conformity with the foregoing. Judgment may be entered accordingly in favor of plaintiff, with appropriate interest and costs.