LONG ISLAND RAIL ROAD COMPANY, Appellant, *v.* PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Respondents. METROPOLITAN COMMUTER TRANSPORTATION AUTHORITY, Intervenor-Appellant.

Second Department, July 22, 1968.

*Sullivan & Cromwell* and *George S. Onken* (*Robert MacCrate, Robert R. Prince, Richard H. Stokes* and *John L. Warden* of counsel), for appellants.

*Kent H. Brown* (*Vincent P. Furlong* and *Martin L. Barr* of counsel), for Public Service Commission, respondent.

*Charles Metz, Village Attorney,* for Village of Rockville Centre, respondent.

BENJAMIN, J. This is an appeal by the Long Island Rail Road Company (hereinafter called LIRR) from a decision and order of the Public Service Commission (hereinafter called PSC). We granted leave to the Metropolitan Commuter Transportation Authority (hereinafter called MTA) to intervene as a party appellant; and MTA has joined in the appeal of LIRR. The

appeal is pursuant to section 91 of the Railroad Law, which authorizes an aggrieved party to appeal directly to the Appellate Division from a decision of PSC relating to a railroad grade crossing. The decision and order herein involved were made in a proceeding brought by the Village of Rockville Centre, under sections 90 and 94 of the Railroad Law, for approval by PSC of the construction of a pedestrian underpass beneath the elevated tracks of LIRR and for a direction by PSC that LIRR or MTA should bear half the cost thereof. The PSC decision held that LIRR, a wholly-owned subsidiary of MTA, is subject to the provisions of sections 90 and 94 of the Railroad Law, which *inter alia* provide (a) that, before a road is built across an existing railroad line, PSC must approve the manner of the road's construction and (b) that the cost of such construction shall be borne in equal shares by the railroad and the appropriate municipality. The PSC order directed the general manner of construction of the pedestrian underpass; directed LIRR to submit detailed plans of the work and a cost estimate to PSC for its approval; and directed LIRR to abey commencement of the work until such approval shall have granted. The sole issue raised by appellants is whether PSC has jurisdiction over MTA and its subsidiaries and, consequently, whether it had jurisdiction to make the subject decision and order. In our opinion it did not.

The issue turns upon the construction of subdivision 8 of section 1266 of title 11 of the Public Authorities Law (title 11 is the Metropolitan Transportation Authority Act, hereinafter called the MTA Act) which both sides insist is plain and unambiguous but which each reads as saying the opposite of what the other says. In relevant part, that section reads as follows:

" The authority may do all things it deems necessary, convenient or desirable to manage, control and direct the maintenance and operation of transportation facilities, equipment or real property operated by or under contract, lease or other arrangement with the authority. Except as hereinafter specially provided, no municipality or political subdivision * * * shall have jurisdiction over any facilities of the authority or any of its activities or operations. The local laws * * * of a municipality or political subdivision * * * conflicting with this title or any rule or regulation of the authority, shall not be applicable to the activities or operations * * * or the facilities of the authority * * *.

" *The jurisdiction, supervision, powers and duties of the public service commission or of the department of public service*

*of the state under the public service law shall not extend to the authority in the exercise of any of its powers under this title.* The authority may agree with the state department of public works for the execution by such department of any grade crossing elimination project or any grade crossing separation reconstruction project along any railroad facility operated by the authority or by one of its subsidiary corporations * * *. Any such project shall be executed as provided in the grade crossing elimination act and the railroad law, respectively, and the costs of any such project shall be borne as provided in such laws, except that the authority's share of such costs shall be borne by the state '' (emphasis supplied).

The critical words in the quoted statute are the emphasized words '' under the public service law '', since PSC contends that they limit MTA's exemption from PSC supervision to only those matters spelled out in the Public Service Law. It urges that the section is clear on its face and does not require construction; that its plain meaning is that PSC still has supervisory powers over MTA with respect to matters dealt with in the Railroad Law; and that a contrary construction (i.e., that PSC has no supervisory powers over MTA under the Railroad Law) would lead to chaos because it would leave wholly unregulated all railroads operated by MTA and its subsidiaries in the metropolitan area.

MTA, on the other hand, contends that the section clearly exempts it from all supervision by PSC because the sole basic grant of supervisory powers to PSC over railroads is in the Public Service Law, and the exemption of MTA from PSC supervision '' under the public service law '' consequently is all-inclusive despite the quoted words; that, while the Public Service Law and Railroad Law give PSC jurisdiction over '' railroad corporations '', MTA and its subsidiaries are not within that category; and that PSC jurisdiction over MTA would be incompatible with the Legislature's sweeping delegation of responsibility to MTA for a vital public function.

We believe that MTA's contentions are sound and that MTA is completely exempt from supervision by PSC.

As the issue is novel, we can look for guidance only to the statutes themselves, their history and purpose, and a few tangential court holdings.

It should be noted at the outset that subdivision 5 of section 1266 of the MTA Act gives all MTA subsidiaries the same privileges, immunities and exemptions as MTA itself has. Hence, if MTA is exempt from PSC supervision, its subsidiary, LIRR, would likewise be exempt.

New York State's regulation of railroads started in 1848, when certain minimum safety and financial standards for railroad corporations were enacted into law. By 1882 there had been established a Board of Railroad Commissioners with powers of investigation. In 1890 the first Railroad Law was enacted. In 1907 the Public Service Commissions Law abolished the Board of Railroad Commissioners and transferred the latter's functions to the Public Service Commissions; and it gave the Public Service Commissions greatly expanded regulatory powers over rates and other matters. At the same time the existing Railroad Law was continued in effect. In 1910 the old Public Service Commissions Law and Railroad Law were repealed, the present Public Service Law and Railroad Law were enacted in their place, and the new laws were expanded and harmonized so that, when read together, they created a unified system of railroad legislation (see *People ex rel. Ulster & Delaware R. R. Co.* v. *Public Serv. Comm.*, 171 App. Div. 607, 609, affd. 218 N. Y. 643).

The Public Service Law, as enacted in 1910 and as it still reads, contains two sections which establish PSC's basic jurisdiction over railroads. Section 5 provides that PSC's " jurisdiction, supervision, powers and duties   *   *   *   shall extend   *   *   *

" 1. To   *   *   *   railroads   *   *   *   and to the persons or corporations owning, leasing or operating the same ".

Section 150 states that the Board of Railroad Commissioners was abolished in 1907 and provides: " All the powers and duties of such board conferred and imposed by any statute of this state shall hereafter be exercised and performed by the public service commission."

There is no equivalent provision in the Railroad Law which confers upon PSC a comprehensive, basic grant of jurisdiction over railroads. There are, instead, numerous substantive sections dealing with specific problems of safety, service, rates, financing, etc., and many of those sections provide for specific regulation of their subject matter by " the commission ". Section 2 of the Railroad Law relates these specific regulatory powers to the basic grant of jurisdiction in the Public Service Law by defining the word " commission " as " the public service commission ".

A similar interconnection between these two statutes is shown by the definitions of " railroad " and " railroad corporation " in section 2 of the Public Service Law and the absence of such definitions in the Railroad Law, even though those terms are

used constantly in the Railroad Law. Obviously, the Legislature intended the definitions of those terms in the Public Service Law to be applied in the Railroad Law as well.

Turning now to the MTA Act, a brief review of its genesis will shed some light on the problem at bar. It is common knowledge that the problems of mass transportation in and around large cities, and particularly in the New York metropolitan area, have been getting more and more complex and difficult in recent years. Much of the trouble in the New York area has been with the various commuter railroads feeding into the city. Their rolling stock became obsolete and their service woefully inadequate; and their financial troubles have been notorious. In the last two decades, the State tried a number of times to solve the problems of commuter railroads by patchwork devices, such as tax relief, while allowing them to remain in private ownership. These devices failed to rescue the railroads, and in 1961 the New York and New Jersey Legislatures authorized the Port of New York Authority to take over one of the commuter railroads, namely, the Hudson and Manhattan Railroad. By 1965 it had become obvious that a comprehensive solution of the multiple problems of these railroads was needed and the MTA Act was enacted, as title 11 of the Public Authorities Law.

The legislative findings preceding the body of the Act state that adequate commuter transportation in the New York metropolitan area is of vital importance to the area, the State and the nation; that the continued deterioration of the commuter railroads is a threat to the State's economic health; that this deterioration has continued despite the help previously given by the State; that it is the declared policy of the State that the preservation and improvement of commuter services is an essential public purpose; that it is in the public interest for the State to take appropriate measures and assume responsibility for the preservation of such essential services; and:

" 6. The urgent    *    *    *    need for the stabilization, strengthening and improvement of commuter services    *    *    * in the metropolitan area can be met by the creation of a public authority to serve as the state's instrument for the carrying out of programs designed to continue and improve commuter services.

" 7. Through such public authority the state could deal flexibly and efficiently with the differing financial, managerial and operational problems involved in insuring the continuation of    *    *    *    essential commuter services " (L. 1965, ch. 324, § 1).

The legislative intent was further stated in sections 1263 and 1264 of the MTA Act. Section 1263 created MTA as "a body corporate and politic constituting a public benefit corporation." Section 1264 states that the purposes of MTA shall be the continuance and improvement of commuter transportation and that such purposes are "for the benefit of the people * * * and the authority shall be regarded as performing an essential governmental function in carrying out its purposes and in exercising [its] powers".

In 1967 the Legislature broadened MTA's powers by making it the ex officio board of the New York City Transit Authority and the Triborough Bridge and Tunnel Authority and by providing that it should "develop and implement a unified mass transportation policy" for the New York metropolitan area (Public Authorities Law, § 1264, subd. 1).

The sweeping powers of MTA, "in order to effectuate the purposes" of the MTA Act, are spelled out in full and comprehensive detail in sections 1265 and 1266 of that act. Section 1265 deals with general powers to sue, borrow money, make contracts, acquire property, hire employees, conduct investigations, etc. Section 1266 deals with MTA's special powers; *inter alia* it provides:

"The authority may establish * * * such schedules and standards of operations and such other rules and regulations including * * * [those] governing the conduct and safety of the public as it may deem necessary, convenient or desirable for the use and operation of any transportation facility and related services operated by the authority * * * . In the case of any conflict between any such rule or regulation of the authority * * * and any local law * * * such rule or regulation of the authority shall prevail". (subd. 4).

"The authority may acquire * * * any transportation facility wholly or partly within the metropolitan commuter transportation district" (subd. 1) [and may operate it through a wholly owned subsidiary corporation which it may, if it so desires, convert into a public benefit corporation with the attributes of "a body politic and corporate" (subd. 5)].

"The authority may on such terms and conditions as the authority may determine necessary, convenient or desirable itself establish, construct * * * operate, maintain, renovate, improve, extend or repair any such transportation facility, or may provide * * * [therefor] by contract * * * or other arrangement * * * with any person" [those powers were also granted with respect to "related services and activities"] (subd. 2).

" The authority may do all things it deems necessary, convenient or desirable to manage, control and direct the maintenance and operation of transportation facilities, equipment or real property operated by or under contract, lease or other arrangement with the authority " (subd. 8).

The foregoing is all the relevant history and legislation. As previously noted, we must resolve the issue at bar on the basis of that matter, aided only by some tangential holdings dealing with other comparable situations.

Citing *Matter of Shea* v. *Falk* (10 A D 2d 142, 144, affd. 8 N Y 2d 1071), PSC urges that we may look only to the words of subdivision 8 of section 1266 and may not resort to other means of interpretation because that subdivision is clear and unambiguous; and it then urges that the subdivision clearly leaves MTA subject to PSC's regulatory supervision under the Railroad Law. We disagree on both counts. We do not find that subdivision as clear and unambiguous as PSC says it is; and we construe it as effecting a complete exemption of MTA from PSC regulation.

As earlier noted, the only basic grant of jurisdiction to PSC over railroads is contained in sections 5 and 150 of the Public Service Law. The Railroad Law contains countless substantive provisions which implement the basic jurisdictional grant contained in the Public Service Law by specifically detailing the matters to be regulated and the manner in which they shall be regulated by PSC, but the Railroad Law itself contains no basic grant of jurisdiction to PSC over the railroads; instead, it merely ties that statute to the jurisdictional grant in the Public Service Law by defining the word " commission " (used in the specific regulatory sections) as meaning the " Public Service Commission ". In short, *all* of PSC's regulatory powers over railroads, though detailed mostly in the Railroad Law, actually stem from the basic jurisdictional grant in the Public Service Law. Hence, the exemption of MTA from PSC jurisdiction and supervision " under the public service law ", contained in subdivision 8 of section 1266 constitutes an exemption from *all* PSC jurisdiction and supervision, including that sought to be exercised by PSC in this case under sections 90 and 94 of the Railroad Law.

This conclusion is fortified by the fact that the Public Service Law and the Railroad Law, as revised in 1910, were intended to constitute " one harmonious system applicable to the subject concerning which both relate," and they consequently " are to be construed together * * * as if they were one statute " (*People ex rel. Ulster & Delaware R. R. Co.* v. *Public Serv.*

416

*Comm.,* 171 App. Div. 607, 609, affd. 218 N. Y. 643, *supra*). The construction urged by PSC would have us violate this rule by reading the Railroad Law and the Public Service Law as separate, unconnected statutes; the construction urged by MTA would follow this rule by reading the two statutes together, as a harmonious whole, with the basic jurisdictional grant in the Public Service Law and the details of its exercise in the Railroad Law.

Also indicative of a legislative intent to exempt MTA from *all* PSC jurisdiction is the fact that subdivision 8 of section 1266 itself provides that MTA may agree with the State Department of Public Works for the latter to execute a grade crossing elimination project in the manner provided in the Railroad Law and the Grade Crossing Elimination Act (L. 1928, ch. 678, as amd.). This provision would have been unnecessary and meaningless if the Legislature, in enacting subdivision 8 of section 1266, had intended to leave MTA generally subject to PSC jurisdiction under the Railroad Law and the Grade Crossing Elimination Act, both of which fully cover the subject of grade crossing eliminations and provide for PSC jurisdiction thereof.

Looking at the question from another point of view, MTA urges that it and its subsidiaries are not '' railroad corporations '' subject to PSC jurisdiction. There is merit in this contention. Section 2 of the Public Service Law defines '' railroad corporation '' as '' every corporation, company, association, joint-stock association, partnership and person, * * * owning, operating or managing any railroad ''; and it defines '' common carrier '' as including '' all railroad corporations * * * and every corporation, company, association, joint-stock association, partnership and person * * * owning, operating or managing any such agency for public use in the conveyance of persons or property ''. The substantive provisions covering the specific details of PSC regulation of railroads use the terms '' railroad corporation '' or '' common carrier '' when referring to the one being regulated.

There are two analogous holdings by the courts which indicate that a public authority like MTA does not come within the ambit of the words '' railroad corporation '' or within the words '' every corporation, company, association, joint-stock association, partnership and person '' as they are used in the Public Service Law and the Railroad Law. In *Sun Print. & Pub. Assn. v. Mayor* (152 N. Y. 257), it was held that the provision in section 17 of article III of the State Constitution which prohibits the Legislature from enacting a special act '' granting to any corporation, association or individual the right to lay down railroad

tracks '' does not apply to a municipality. [To the same effect is *Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110.] As the legislation creating MTA makes it the '' state's instrument '' (L. 1965, ch. 324, § 1, par. 5) or arm for the performance of an '' essential governmental function '' (MTA Act, § 1264, subd. 2), it comes within the rationale of the *Sun Printing* case.

Also relevant is *City of New York* v. *Brooklyn City R. R. Co.* (232 N. Y. 463), which involved the question whether the city had to obtain a certificate of public convenience and necessity from PSC (required in the case of railroad corporations under section 9 of the Railroad Law and section 53 of the Public Service Law) before it could build a railroad in the streets and over the Williamsburg Bridge. Holding that the city did not have to obtain such certificate, the court said (pp. 470–471): '' In order to operate the railroad and to construct the necessary trackage, no certificate of public convenience and necessity nor permission of the public service commission is required. The right and franchise to operate its railroad under contracts under the special statutes vested in the city as a municipal corporation, not as a railroad corporation or private common carrier * * * . The entire scheme under which the bridge was constructed indicates plainly that the city's authority comes direct from the legislature and not through the public service commission, and that convenience and necessity and permission were all decreed * * * by legislative fiat.'' Analogously, MTA's authority and powers, under the MTA Act, '' comes direct from the legislature and not through the public service commission '': MTA's right and responsibility to take over and operate the Long Island Rail Road, pursuant to the powers granted it in the MTA Act, '' vested '' in MTA as '' a body corporate and politic '' acting as the '' state's instrument '' for the performance of an '' essential governmental function,'' '' not as a railroad corporation or private common carrier ''; the necessity for MTA to take over the jurisdiction of *all* metropolitan transportation problems (including not only planning but also the actual operation of transportation facilities), because the public welfare so required, was decreed '' by legislative fiat '', expressed in the MTA Act itself and in the legislative findings preceding it; hence, MTA has the power to operate the LIRR, control its property and do all things it deems necessary or desirable in connection with those functions, without obtaining permission or approval from PSC for the doing of those things.

MTA also urges, correctly in our opinion, that PSC jurisdiction over MTA and its subsidiaries is incompatible with the Legislature's delegation of responsibility for a vital public

418

function to MTA. As previously noted, the legislative findings and sections 1264 and 1275 of the MTA Act state that MTA is a public authority created to serve as the State's instrument in carrying out an essential governmental function and public purpose, namely, the stabilization and improvement of commuter transportation services. Even a cursory reading of sections 1265 and 1266 of the MTA Act shows that the powers conferred on MTA for the achievement of those broad purposes are sweeping and comprehensive. As MTA's brief notes, "it would be wholly inappropriate to apply to the MCTA in the discharge of its public responsibilities a system of [detailed] regulation [like that in the Railroad Law] which was specifically designed to mediate between private enterprises and the public who are dependent upon them for service."

Nor would the Legislature have given MTA such sweeping powers and responsibility for all phases of transportation in the metropolitan area (encompassing long range and short range planning, maintenance and improvement of existing facilities, and the power to do anything it thinks necessary or desirable in accomplishing those purposes) if it intended it to be subject to PSC supervision so that it would have to go hat in hand to PSC for permission every time it wanted to do something. Moreover, there are numerous sections in the Railroad Law, requiring PSC approval for acts by railroad corporations, which are in direct conflict with sections of the MTA Act empowering MTA to do those same things if it [MTA] believes them necessary, convenient or desirable (see, e.g., Railroad Law, §§ 21, 24, 54, 55, 71, 81, 90, 94; and MTA Act, §§ 1266, 1267).

For all these reasons, it seems clear to us that the Legislature intended MTA and its subsidiaries to be wholly exempt from PSC supervision and regulation in the performance of its functions under the MTA Act.

PSC argues that this construction of section 1266 "would leave municipal chaos in its wake" because it would wipe out the entire scheme of government regulation of railroads which has been developed to protect the public safety and welfare, insofar as it applies to subsidiary railroad corporations acquired by MTA and would leave in its place subjugation of the public and the municipalities "to the [unregulated and unsupervised] whim and caprice of MCTA" and grave danger to the public safety and welfare.

We are not impressed by this argument. The Legislature has created MTA as its instrument for the carrying out of an essential and urgent governmental function and has seen fit to entrust it with extremely broad powers and responsibilities in the carry-

ing out of that function — powers and responsibilities broad enough to encompass all the detailed provisions in the Railroad Law. We fail to see why one arm of the State (MTA) would be less trustworthy and less devoted to the public interest than another arm of the State (PSC), or why the public welfare and safety would be in grave danger unless PSC supervises and regulates the way MTA carries out the essential State function entrusted to it by the Legislature. Indeed, the division of responsibility and power that PSC desires would tend to frustrate the main purpose of the MTA Act, which was to centralize in one body (MTA) the authority and responsibility to develop a co-ordinated, comprehensive system of mass and private transportation in the metropolitan area and to bring stability and order out of the present chaos and instability in that area.

We conclude that PSC lacked jurisdiction to make the decision and order directing the manner in which the underpass should be built under the LIRR tracks and directing LIRR to pay half the cost thereof, pursuant to sections 90 and 94 of the Railroad Law. Consequently, we should reverse the PSC decision and order, on the law, without costs, and dismiss Rockville Centre's petition for approval of the construction of the underpass and for assessment of half the costs upon LIRR, without costs.

BRENNAN, Acting P. J., RABIN, HOPKINS and MUNDER, JJ., concur.

Decision and order of the Public Service Commission, both made on April 4, 1967, reversed, on the law, without costs, and petition of the Village of Rockville Centre dismissed, without costs. No questions of fact were considered.