John C. Marbach, J.
The Metropolitan Transportation Authority is seeking to enjoin the Village of Tuckahoe from enforcing its building code as it would apply to the construction of a footbridge overpass connecting the new high level platforms above the Penn Central right of way located at the Crestwood station within the Village of Tuckahoe.
The village opposes on the grounds that the construction is in violation of section 8 of article VII of the New York State Constitution, which prohibits the gift or loan of State moneys to or in aid of private corporations. In this case, it is conceded that public moneys are funding the contract of June 4, 1971, between the trustees of Penn Central Railroad and Cayuga Construction Corporation for the construction of high level platforms with this passenger access facility. The MTA contends this project is authorized by statute (Public Authorities Law, tit. 11) and specific appropriations of the Legislature; the village argues it is an illegal and unconstitutional expenditure of public moneys for private gain. The court will first outline the *897 facts giving rise to this litigation, will then set forth the statutory authorization, and will conclude with its decision.
FACTS
In an attempt to alleviate the well-recognized problems which beset urban-suburban commuter transportaiton in the New York metropolitan area, the MTA and Public Service Commission decided in the fall of 1970 that Penn Central should purchase 80 new self-propelled commuter cars. The price was approximately 23 million dollars. The cars were built on an already existing operative production line. Because of this, the cars were delivered quickly and are ready for service. However, because they are similar in structure to the subway trains used in New York City, the passenger stations must be reconstructed and raised to the floor level of the cars. To do this, it takes money.
Back in the spring of 1970, the Legislature appropriated 44.4 million dollars pursuant to chapter 473 of the Laws of 1970 for the rehabilitation and modernization of commuter railroad service on the Hudson and Harlem Divisions of the railroad. That bill provided, in section 2 thereof, “ No part of the appropriation made by this act shall be available for expenditure until the authority shall have purchased or leased the assets used by or comprising the said divisions, or until it shall have entered into a joint service arrangement with the owner or operator
No money was yet available for the immediately necessary alteration of these facilities to accommodate these new trains so the Legislature was called into action again to give the MTA some money to do the improvements. By chapter 1 of the Laws of 1971, the Legislature appropriated 7.5 million dollars for the alteration and improvement of railroad passenger 'stations along the Hudson and Harlem Divisions of the Penn Central. This appropriation made no mention of a purchase, lease or joint service arrangement as did the original 'appropriation. However, this amount reduced the original appropriation of 44.4 million dollars to 36.9 million dollars. On February 3,1971, the trustees of the Penn Central and the MTA, citing this 1971 legislative grant of 7.5 million dollars, agreed to provide for the betterment of Penn Central’s commuter railroad facilities. This agreement provided that Penn Central, using its own forces and equipment and the forces and equipment of others, shall alter and improve the railroad passenger stations in the electrified zone of the facility within Westchester including the construe *898 tion of high level station platforms and 'appurtenances and the alteration to existing platforms and stations and ancillary track changes. All of this was to he at the MTA’s expense up to a limit of the appropriation figure of 7.5 million dollars. On June 4, 1971, Penn Central entered into 'an agreement with Cayuga Construction Corporation for the construction of high level platforms with passenger .access facilities for the Harlem line.
Construction commenced in July of 1971. On September 1, 1971, the Mayor of Tuckahoe, the Building Inspector and a policeman appeared on the job site and ordered the work stopped because, among other things, no building permit had been issued. The Mayor was acting in his official capacity after complaints from various segments of the community, both old and young, about the alleged safety hazards and esthetic damage which would be caused by the footbridge overpass. In this respect, the record contains a detailed factual affidavit from the chief regional engineer of Penn Central which sets forth all the precautions taken by the railroad to protect the citizens who use its facilities. The affidavit also attempts to answer and elaborate on the points raised by the Mayor in his objections to this project.
An order to show cause containing a temporary restraining order was signed by me on September 1, 1971, returnable September 10, 1971. After the return date, the court received numerous letters from respective counsel and the community, as a result of which the matter was not fully submitted until September 30, 1971.
STATUTES
In 1965, the Metropolitan Transportation Authority was established by the Legislature pursuant to chapter 324 of the Laws of 1965, now codified in title 11 of the Public Authorities Law. Its purpose was to continue, further develop and improve commuter transportation and other related services within the metropolitan transportation district, which includes Westchester. (Public Authorities Law, § 1264.) A further purpose was to develop and implement a unified mass transportation policy for the district. (Public Authorities Law, § 1264, subd. 1.) The Legislature specifically declared that such purposes are for the benefit of the People of the State of New York and the MTA shall be regarded as performing an essential governmental function in carrying out its purposes. (Public Authorities Law, § 1264, subd. 2.)
The title defined certain terms used throughout the title which are important to this litigation. “ Joint service arrangements ” *899 are defined in subdivision 7 of section 1261 as “ agreements between or among the authority and any common carrier * * * relating to property, buildings, structures, facilities * * * for or in connection with or incidental to transportation in part in or upon railroad * * * facilities located within the district. ’ ’ “ Railroad facilities ” are defined in subdivision 10 of section 1261 as 1 ‘ right of way and related * * * stations * * * and other real estate or personalty used or held for or incidental to the operation, rehabilitation, or improvement of any railroad * * * including but not limited to buildings, structures, and areas ’
It is apparent to this court from this definition of railroad facilities that the project now proceeding at the 'Crestwood station is encompassed within the definition of a “railroad facility ”.
In order to effectuate the purposes of the MTA, the Legislature gave it certain general and special powers. The general powers include the power “ to do all things necessary, convenient or desirable to carry out its purposes and for the exercise of the powers granted in this title” (§ 1265, subd. 14). The special powers include the power to provide “ on such terms * * * as the authority may determine necessary, convenient or desirable ’ ’ for construction, maintenance, renovation, improvement, extension or repair of any “ such transportation facility, or may provide for such establishment, construction, effectuation, operation, maintenance, renovation, improvement, extension or repair by contract, lease or other arrangement [emphasis supplied] on such terms as the authority may deem necessary, convenient or desirable” (§ 1266, subd. 2). Finally, assuming arguendo, that MTA is proceeding lawfully, then subdivision 8 of section 1266 becomes operative. That section states as follows: “ 8. The authority may do all things it deems necessary, convenient or desirable to manage, control and direct the maintenance and operation of transportation facilities, equipment or real property operated by or under contract, lease or other arrangement with the authority. Except as hereinafter specially provided, no municipality or political subdivision, including but not limited to a county, city, village, town or school or other district shall have jurisdiction over any facilities of the authority or any of its activities or operations. The local laws, resolutions, ordinances, rules and regulations of a municipality or political subdivision, heretofore or hereafter adopted, conflicting with this title or any rule or regulation of the authority, shall not be applicable to the activities or operations of the *900 authority, or the facilities of the authority, except such facilities that are devoted to purposes other than transportation purposes. Each municipality or political subdivision, including but not limited to a county, city, village, town or district in which any facilities of the authority are located shall provide for such facilities police, fire and health protection services of the same character and to the same extent as those provided for residents of such municipality or political subdivision.”
It appears from the record that the MTA relies on the fact that its supervision and control of the construction project at the Crestwood station is lawful since it has been authorized by the Legislature and since it conforms to the basic purposes and powers granted to it. As indicated above, the village contends that this construction is unlawful because it does not comply with the language of the appropriation since there is no lease, purchase or joint service arrangement and is unconstitutional because it involves the expenditure of public moneys for private benefit.
LAW
The court grants the motion for the preliminary injunction.
The public benefit plus a reading of all the applicable statutes and the Legislature authorization compel this conclusion. This decision is not arrived at easily. The position of the MTA has evolved considerably from its initial position in its original papers and on the oral argument. Defendant has skillfully attempted to rebut each and every point, new or old, raised by plaintiff. The court is convinced, however, that the MTA, despite the absence of the so-called “ takeover ” agreement, is proceeding lawfully and in the best interests of the general public. The court notes that the imminency of the takeover agreement is totally irrelevant as a predicate for the authority of the MTA to do the work. Only the facts as they now exist are before this court and only these facts are being considered.
The critical factor in the court’s decision is the court’s belief that on this type of injunctive proceeding the court must consider and attach paramount importance to the public interest aspects of the litigation. Secondly, the court finds that the agreement of February 3, 1971, constitutes an “ arrangement ” within the specific language of subdivision 2 of section 1266 of the Public Authorities Law which enables it to undertake the instant construction.
It is well settled that in ruling upon a motion for a preliminary injunction, the movant must prove (1) the likelihood of its ultimate success on the merits, (2) irreparable injury to it if *901 the injunction is not granted, and (3) a balancing of the equities in its favor (Park Terrace Caterers v. McDonough, 9 A D 2d 113; Barricini, Inc. v. Barricini Shoes, 1 A D 2d 905; Gilbert v. Burnside, 6 A D 2d 834; Albini v. Solork Assoc., 37 A D 2d 835). All of these factors, plus the overriding considerations of the public interest, are present in this case. The court must weigh the interests of the general public. Barney v. City of New York (83 App. Div. 237 [1st Dept., 1903]) (injunction to restrain further construction of rapid transit tunnel because of the enormous public interests involved) cited1 in Weinstein-KornMiller, N. Y. Civ. Prac. (vol. 7A, par. 6301.21); De Pina v. Educational Testmg Serv. (31 A D 2d 744 [2d Dept., 1969]). Barney involves a strikingly similar fact situation almost 70 years ago. Special Term denied the motion for a preliminary injunction by the owner of a dwelling house who claimed he was being injured by the construction of the Rapid Transit system under Park Avenue. The Appellate Division recognized the problems attendant upon injunction proceedings when work has begun and in progress. It stated that to stop the work after it was begun and substantial progress made would be without any advantage to plaintiff and would subject plaintiff and others to danger from the unfinished project {Barney, p. 241). The court then stated: ‘ ‘ The importance of the public improvement, the fact that it has involved the expenditure of a large amount of public money, and the necessity for additional means of transportation of passengers in New York, are facts which should be considered in determining whether the court should interfere by an injunction which would prohibit the completion of a public improvement. Barney is not exactly in point because it does not involve the particular constitutional question raised in the instant litigation. It is, however, very similar to this case in both the factual problem and legal solution employed by the Appellate Division.
In the instant action, the statutory authorization and purpose is specifically stated to be the creation of a public benefit corporation performing an essential governmental (as opposed to proprietary) function for the benefit of the general public (§ 1264). It is rare that there is specific statutory language to this effect to assist the court in its determination. Normally, a court may have to determine whether the public interest is affected. In this case, however, the Legislature has determined this for the courts and this court cannot and should not interfere with the legislative determination.
Furthermore, as previously indicated, the court will often balance the hardship involved in this type of situation. {Greenwich *902 Towers Assoc. v. McLean, Grove & Co., 17 A D 2d 733 [1st Dept., 1962]; 7A Weinstein, Korn and Miller, N. Y. Civ. Prac., par. 6301.20.) In doing so, the court must weigh the annoyance of some members of the local community against the needs of the general commuter public not only in the Village of Tuckahoe and the surrounding communities which use that station, such as residents of Yonkers, but also the effect it would have on the commuter trains which may not be able to stop at the Crestwood station if all of the improvements, which are part of an integral plan, were curtailed even on a temporary basis. However justified the complaints about the esthetic and safety aspects of this bridge might be, these considerations of necessity must yield to the hardship to both the commuting public and to the cause of public transportation if the temporary injunction were denied.
A word must be said about defendant’s argument that a temporary restraining order should not have been granted against a municipality engaged in the performance of a statutory duty pursuant to CPLR 6313. This is a correct statement of the law as a general proposition, but in the opinion of this court in the fact situation at bar the court must balance the statutory obligation of the municipality and its appointive officials to enforce its building regulations against the statutorily recognized needs of the general public. The municipality’s obligation to enforce its regulations in this case must yield to what the Legislature has determined is the greater public benefit.
It is conceded that a “ takeover ” of the Penn Central facilities and operations by the MTA has not yet taken place. Under what authority is this whole operation proceeding? This is a critical question and the court finds that the agreement of February 3, 1971, is an “ other arrangement ” within the statutory language of subdivision 2 of section 1266 of the Public Authorities Law. The inclusion of the phraseology in the statute appears to the court to be a catchall phrase designed for just this type of situation. While there would have been greater weight to plaintiff’s position had the “takeover” been consummated; see the learned opinion of Mr. Justice Benjamin in Long Is. R. R. Co. v. Public Serv. Comm. (30 A D 2d 409 [2d Dept., 1968], affd. 23 N Y 2d 852 [1969]); the takeover is not essential to this decision. The Legislature has given the MTA sweeping powers and responsibilities for all phases of short-run transportation in the metropolitan area encompassing long-range and short-range planning, maintenance and improvement of existing facilities, and the power to do anything it thinks necessary or desirable in accomplishing these purposes. (Long Is. R. R. Co., supra, p. 418.) The authorization and powers are so *903 broad in fact that it is difficult to envisage a situation where the courts could restrain the MTA unless there was a clear showing that there was absolutely no legal basis for its conduct.
Any curtailment of these powers would lie in legislative, not judicial, action.
Since the authority for the MTA’s action is established in the statutory authorization of subdivision 2 of section 1266, what is really present is the expenditure of public funds for a public benefit, the work to be performed by a private, independent contractor for ultimate benefit of the general public. This is so despite the absence of a purchase, lease or joint service arrangement contained in the 1970 appropriation since this court finds that the statutory language of ‘ ‘ other arrangement ’ ’ is controlling and has been met by the agreement of February 3, 1971. Therefore, the expenditure is constitutional and outside the scope of People v. Westchester County Nat. Bank (231 N. Y. 465).
Once the authority for doing the work is established, then the municipality cannot interfere with the work pursuant to subdivision 8 of section 1266. The MTA has the clear right to the requested relief and the application for the injunction must be granted. Therefore, the work may proceed free from the interference of the Village of Tuckahoe.