OPINION OF THE COURT
Joseph Goldstein, J.
Plaintiff, in this breach of contract action, sues for a refund which he claims is due him as a result of defective service, as well as, price and refund discrimination. Plaintiff urges that the Long Island Railroad (LIRR) has failed to perform certain services which plaintiff alleges are part of defendant’s contractual obligation. While the money sought by plaintiff is acknowledged by both plaintiff and defendant to be de minimus, the principles of this litigation have substantial meaning to both litigants.
The primary question which this court must answer is — what are the terms of the contract of carriage when one purchases a ticket on the Long Island Railroad? Is this question to be examined in view of the equipment utilized by and the technology available to defendant when it transported President Theodore Roosevelt to Sagamore Hill and internationally famous financiers to Long Island’s “Gold Coast” at the turn of the century, or should it be viewed in light of the current equipment offered to the *1068 populous “Dashing Dans” who race for the 8:02 each workday morning? The latter interpretation is most compelling, and appears to be relatively free of recent judicial consideration. (However, see Javeline v Long Is. R.R., 106 Misc 2d 814.)
I
The facts are found to be as follows: plaintiff purchased tickets from the defendant for travel on the LIRR from different points in Nassau County to both the Manhattan and Brooklyn terminals of defendant; that during the period July 14 to July 21, 1980, plaintiff traveled on 12 such trips and found that the climate control system in the cars in which he traveled were not operating on 10 trips so as to provide any comfort or relief from the heat and humidity; that plaintiff observed various passengers, on more than one occasion during this period, “kick out” windows in the cars in which plaintiff was a passenger; that plaintiff observed various passengers refuse to display tickets of carriage to train personnel; that on occasion, train personnel did not enforce the regulations of the defendant that a passenger either display a ticket, pay a fare, or be asked to leave the train at an appropriate station (usually the next one) or be arrested; that the weather was warm and humid, in the 90 degree range (climatological reports were admitted in evidence).
Plaintiff now seeks refunds for the price of the tickets for the 10 trips on two theories. First, that there was no air conditioning on the trains. Second, a refund based on an alleged discrimination perpetrated against the plaintiff which he defines as “Price and Refund Discrimination”. This court will address itself only to the first theory since there was no substantial proof offered to support the second theory.
II
Defendant did not offer any affirmative defense in its own behalf. It should be noted, that after plaintiff rested, defendant chose not to call any witnesses, but rested after making certain motions. This court, however, feels compelled to place upon the record its findings regarding the *1069 testimony offered by defendant’s employees. In lieu of producing the president of the defendant corporation, the defendant produced three employees, pursuant to subpoena, each of whom were called as plaintiff’s witnesses: the Assistant Chief Mechanical Officer in Charge of Operations, Mr. Edward Case; the person responsible for the maintenance of the rules and regulations and the tariffs of the defendant, Mr. Mark Smith; and the General Chairman of the United Transportation Union, Mr. Edward Tule, Jr. These men were produced and certain exhibits were admitted into evidence, for the most part, upon the consent of both litigants.
Mr. Edward Case, Assistant Chief Mechanical Officer in Charge of Operations, whose detailed testimony covers approximately 100 pages of transcript, not only confirms many facets of plaintiff’s testimony, but went on to explain some of the problems facing the defendant in regard to the air conditioning of the railway cars and the steps which defendant had taken to remedy the problems.
Essentially, Mr. Case testified that in July of 1980, the defendant was experiencing approximately a 55 to 65% failure rate of the air-conditioning systems; that is, they were unable to maintain the interior temperature within the railroad car as specified by its designers and manufacturer. The court, in passing, wishes to point out that the testimony established that the temperature in an un-airconditioned car is usually 30 degrees higher within the confines of Pennsylvania Station than the ambient temperature outdoors. So, for example, if it were 90 degrees outside, in Penn Station the temperature at platform level in an un-air-conditioned car would be 120 degrees Fahrenheit.
During the summer months of 1980, the defendant was aware that passengers were “kicking out” the fixed windows creating a danger to the safety of the passengers and during the month of July, 1980, over 200 windows had to be replaced. Normally, there would be no windows replaced and the witness stated that there was a direct relationship between the inability of the defendant to provide air conditioning and the windows being “kicked out”.
*1070 Mr. Case testified that there was “a continuous year-round maintenance program on the air conditioning system on the M-l car”. The system was designed to maintain a 73 degree interior temperature, whether winter or summer. During the last few years, the defendant observed a problem with the condensor units on the M-l cars; that the air flow was starting to be blocked within the condensor which is a key portion of the air-conditioning system.
The maintenance programs were designed around the manufacturer’s original specifications. When the problem was noticed, the defendant intensified cleaning and “back blowing” the condensor coils to remove the dirt with little success. The cross section of the condensor coils “is rather small” and “we were trying various chemical cleaners over a two — three year period. Only extremely strong (chemical) cleaners were effective which we were only able to use in certain shop areas. The nature of the dirt clogging the coils and fins was a combination of road dirt, brake shoe dust and salt from the atmosphere”. (It should be noted that this condensor was mounted beneath the passenger car and there was no testimony in reference to any filters or protective covers being used either in the winter or summer.)
The witness went on to state that in July, 1980, “we knew we were having a problem and we, together with a chemical corporation, developed a chemical cleaner and were finally able to clean out the condensors to the point where we would get the original air flow back across the coil”. It took until mid-August to get an effective air-conditioning system in the cars.
This chemical spray, combined with air and water pressure, was used in a program to clean the clogged condensors as an emergency measure. The program entailed two work shifts, seven days a week, in an effort to get all the cars and condensors clean.
Mr. Case acknowledged that there might have been other approaches to resolve the problem, but the defendant, in its judgment, chose not to pursue them. When asked by the plaintiff, “When were you first aware of the problem”, the witness responded, “We had experienced the rising head pressures approximately two and a half to *1071 three years ago. This was an ongoing and increasing condition for the past two — three years. We have tried to develop a chemical cleaner that would be safe to utilize”. The defendant did, however, hire a refrigerator technician from the manufacturer of the system, who is still employed by defendant.
Ill
Clearly, it has been established that there existed, during the time in question, a lack of air conditioning on certain of defendant’s trains, but defendant urges that plaintiff is not entitled to air conditioning. Again, returning to the primary question, just what does the plaintiff buy when he purchases a ticket from defendant?
Plaintiff, as a potential passenger on the defendant LIRR trains, indicated his intention to accept the defendant’s offer to ride the LIRR when he purchased a ticket either from defendant’s ticket agent prior to boarding the train in question, or as sometimes occurs, after boarding the train when the passenger may purchase a ticket from the defendant’s employee “on board”. Since the traditional contract is complete upon a “meeting of the minds” between the offeror, the LIRR in this case, and the offeree, the passenger, the contract, if there is one, must be one shaped and defined by implication.
An implied contract consists not of a blank canvas, but rather, of the etchings, lines and colors placed on the canvas, by the acts of the parties and thus, is a piece of art created for the viewer to interpret. Where the words between the first sentence and the final clause are nonexistent, the terms and their meanings must be supplied by the acts of the parties and a determination made as to whether their expectations are reasonable under all the circumstances.
This contract between the LIRR and the plaintiff is not the usual “iron fisted” contract shaped and hammered out upon the anvil of the negotiating table. The passenger has no individual ability to negotiate a contract in the open marketplace at “arm’s length”. This arrangement is not even comparable to a standard-form contract such as might be found in the banking business, credit business or insur *1072 anee business. In each of those situations, while the form of the contract is preprinted and may in fact be identical as between one offeror or another, the other party to the contract has a “choice of vendor”. And, that choice may be as meaningful to the purchaser as the actual ability to negotiate the specific terms of the contract itself.
In the case before this court, however, such a choice is nonexistent. To quote the colloquialism, as far as the commuter by public transportation is concerned, in order to transport oneself between the eastern counties of Nassau and Suffolk to New York City, the LIRR is “the only show in town”. The only meaningful alternative plaintiff, a resident of this county, retains, if he is dissatisfied with the services offered by the defendant, is to drive his private automobile.
Clearly, in these days of energy concern, such an alternative is not only unrealistic, but is counterproductive to the public and national interest. The public policy of our State has more than once been enunciated by our State Legislature and our two most recent Governors. They have supported, as has the electorate, two transportation bond issues, one of the express purposes of which was to improve the rail commuter service offered to the residents of the State and in particular, to the residents of Long Island by the defendant. The mass transit systems which serve our population centers should not be permitted to deteriorate. The unfortunate alternative is reduced ridership and the strangulation of our community by automobile traffic and pollution of the very air we breathe.
“ ‘Our transportation system plays a pivotal role in strengthening our State’s economy. Recognizing this, four years ago the voters of this State wisely approved a $250 million Rail Bond Issue to improve rail freight and commuter service throughout the State, leading to a combined Federal and State investment of nearly $600 million.’
* * *
“In a time of energy shortages, it is essential to provide a comprehensive program of energy conservation”. (Governor Hugh Carey’s approval memorandum on Transportation Bond Issue, L 1979, ch 369, NY Legis Ann, 1979, pp 220-221.)
*1073 What then are the services offered by the defendant which this plaintiff may reasonably anticipate when he purchases a ticket?
Defendant’s witness, Mr. Smith, says that it is “Transportation between the two stations or zones that are shown on the ticket. We don’t guarantee a seat”. Mr. Case testified that the ride is to be performed “with a semblance of being on time”. Are these, however, the extent of defendant’s obligation? This court says no! The defendant has given plaintiff reasons to expect more.
At common law, a common carrier, such as a passenger railroad, was obligated to exercise the highest degree of human foresight and skill to provide for the safety of its passengers (Willis v Long Is. R.R. Co., 34 NY 670).
“When a person [has offered] himself *** as a passenger, and *** has been accepted as such”, the relation of passenger and carrier has begun. By its contract of carriage (defendant) assumes an obligation towards its passenger to transport him carefully to its terminus “to conserve the safety, convenience and comfort of its passengers” (Garricott v New York State Rys., 223 NY 9, 12, 13) and the carrier does so with a heavy duty of care (Kelly v Manhattan Ry. Co., 112 NY 443). Common carriers have been held liable for their negligence in failing to heat their waiting rooms in the winter, failure to heat its vehicles in the winter and on occasion, failure to provide seats. (Elliott, Railroads; White, Personal Injuries on Railroads; Ann., 33 ALR2d 1354.)
According to the testimony of defendant’s Assistant Chief Mechanical Officer, Mr. Case, the defendant presently possesses 1,068 passenger cars among its rolling stock, almost all of which contain air-conditioning units. Concerning these units, Mr. Case stated: “We would not have the air conditioning units if they were not required for passenger comfort.” More than two thirds of these cars, some 764, have been purchased within the past 10 to 12 years after great expense in time and money seeking an appropriate design. This design (the M-l car) contained certain safety and comfort features which have been “updated” and “improved” over the years. In addition, these cars have been continuously added to the defendant’s roll *1074 ing stock, replacing passenger cars of earlier design. Some of the changes are within the memory of many of today’s riders of defendant railroad. The new “M-l” car has no movable windows in the passenger area, but rather, has a double glazed material installed as a “fixed” window. This design feature was installed for several reasons. One reason was to avoid danger and injury to passengers from the impact of foreign objects which have been thrown at the windows and in the past, have caused the windows to break. Another reason was that the new windows prevent a passenger from opening a window and carelessly extending a portion of his body outside the train, which could result in injury. In order to provide additional safety, the doors at either end of the cars have automatic closing devices so that no person will be injured while walking from one car to another.
In lieu of movable windows, an integrated heating and ventilating system was designed and installed by defendant’s experts to provide and maintain “whether winter or summer” a temperature in the passenger car of approximately 73 degrees Fahrenheit. This design has been used by defendant for the past decade. The degree of temperature is a design criteria and standard in each car and the thermostat cannot be adjusted. It would appear, therefore, that defendant, by its indorsement and utilization of the design by Lewis T. Klauder and Assoc, and the public bid and purchase of the M-l car, intended that the plaintiff and others in plaintiff’s position, could reasonably expect the benefits of the many safety features built into the vehicle and together with the concomitant and necessary climaté control features as well.
The defendant will be heard to say that it is not obligated to provide these creature comforts. Such is not the case. Heat was required long ago and air cooling is not exactly a new and innovative feature of rail travel. It started with open windows and electric fans and by 1930, and the years immediately following, air-conditioning equipment in the modern sense, had been tested and installed. (See The American Railroad Car by John H. White, Jr.) While it is true that a common carrier is required to provide and use the best machinery and appliances known and in general *1075 practical use, it need not adapt and use every safety device in existence. The courts of New York have held that it would be negligent to fail “to introduce any improvements in its apparatus which it knows have been tested and found materially to contribute to safety, and the adoption of which is so within its power as to be reasonably practicable.” (Smith v New York & Harlem R.R. Co., 19 NY 127; 7 NY Jur, Carriers, § 371.) It may well be that there was not a need to provide sophisticated ventilation systems as were designed by defendant’s agents more than 10 years ago, but once having done so, and offered the benefits to be reasonably expected therefrom, defendant should not be heard to say that these benefits are not within the terms of their offer to the passenger.
IV
The Legislature has recognized the need to codify that which may be expected of a “common carrier” and has done so in section 96 of the Transportation Law (formerly Public Service Law, § 26) which states: “Safe and adequate service; just and reasonable charges. Every corporation, person or common carrier performing a service designated in the preceding section, shall furnish, with respect thereto, such service and facilities as shall be safe and adequate and in all respects just and reasonable.” (Emphasis added.)
It becomes the duty of this court to determine whether the transportation provided to plaintiff was “safe and adequate and in all respects just and reasonable.” While the meaning of a statute does not vary, the scope of its application must expand or contract to meet the new and different conditions which are constantly coming within the field of its operation. In a changing world, it is impossible that it should be otherwise. (Euclid v Ambler Co., 272 US 365, 387.)
The principle enunciated by Judge Cardozo, in a leading case, states the challenge as follows: “Precedents drawn from the days of travel by stage coach do not fit the conditions of travel to-day. The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be.” (Mac *1076 Pherson v Buick Motor Co., 217 NY 382, 391.) The same is true as it applies to the conditions of passage offered by a common carrier.
Must this court, in making this determination, accept the voice of the defendant, by its agents, Mr. Case and Mr. Smith, as the binding parameters within which the railroad makes its offer of transportation? I believe not. To permit such a narrow construction would cloud the facts by judicial myopia and hold the judicial system up to ridicule. This court is not blind to the realties of suburban life. “[T]here comes a point where this Court should not be ignorant as judges of what we know as men.” (Watts v Indiana, 338 US 49, 52 [Frankfurter, J.].)
Defendant’s position of immense, almost monopolistic strength as compared to the relative lack thereof of this individual plaintiff, places this court squarely in the middle; where else can plaintiff seek a remedy? “[T]here is the vigilance of the common law which, while allowing freedom of contract, watches to see that it is not abused”. (Lee & Son v Railway Executive [1949], 2 AELR 581, 584, Denning, L.J.)
There is a principle of law which in English and American courts has been referred to as contracts of adhesion or the principle of unconscionability.
The relative bargaining positions of the individual plaintiff and defendant herein are so disproportionate that to accept defendant’s enunciation of the “offer” would be grossly unreasonable and unrealistic considering all the credible evidence. This court finds that there is more than an express promise to take plaintiff from point “A” to point “B”. There is an obligation to do so within a reasonable time frame, with a modicum of human comfort and safety which may well be defined minimally by the ability of the equipment which defendant designed, purchased and offered to the riding public for its use.
The defendant must be held responsible, consistent with section 96 of the Transportation Law, to provide the services it is capable of providing with the equipment it has purchased. Likewise, there is a parallel obligation, that having purchased this equipment, at not some insubstan *1077 tial cost, the defendant is obliged to keep same in good working order.
This must be accomplished, short of an “Act of God” which might make it impossible. The evidence before this court is overwhelming that in the instant case there was no such unexpected catastrophe which might excuse defendant’s failure to perform its contract of carriage. Furthermore, failure to secure the necessary changes, modifications or spare parts will not, under these circumstances, sustain a rational defense to this breach of contract litigation. Having determined that the plaintiff is entitled to expect the creature comforts offered by the equipment designed, purchased and utilized by defendant, and the plaintiff having failed to receive these comforts on 10 out of 12 trips as a passenger of defendant, the issue of plaintiff’s damages must be addressed.
V
It is apparent that plaintiff did not receive all that he had reason to expect, but he was transported from point “A” to point “B”, uncomfortable though it may have been.
Plaintiff has the burden of demonstrating the extent of his damages. To receive a full refund after receiving a portion of the consideration, without more, would be unjust. Plaintiff has failed to substantiate the nature and extent of his damages arising out of this action for breach of contract. For this court to speculate as to the extent or quantity of plaintiff’s damages, would be conjecture, and therefore, improper. (R & I Electronics v Neuman, 66 AD2d 836.)
Damages will be awarded as long as they are not uncertain, contingent or conjectural, even though the amount cannot be determined with absolute certainty. (Wakeman v Wheeler & Wilson Mfg. Co., 101 NY 205.) However, the plaintiff must supply some basis of computation for determining the amount of the damages.
It therefore is the decision of this court that plaintiff shall be awarded judgment which perhaps is more symbolic than quantitative. Judgment for nominal damages for plaintiff in the amount of $1, plus costs of this action.