OPINION OF THE COURT
Harvey J. Fried, J.
This action by a Conrail commuter for breach of his contract of carriage, by reason of Conrail furnishing persistently late, overcrowded, unheated, odorous and filthy trains, requires at the outset a determination of the nature of the rights and obligations to which his commutation ticket entitled him.
i
THE STANDARD OF SERVICE TO WHICH A PASSENGER IS entitled:
The common-law view, well settled as early as Willis v Long Is. R.R. Co. (34 NY 670, 683), was that a passenger was entitled to be transported “safely and properly” within “suitable and reasonable accommodations”. The Railroad Law and Public Service Law, adopted in 1910 (consolidat *930 ing earlier enactments), thus were declaratory of the common law in mandating that common carriers furnish “such service and facilities as shall be safe and adequate and in all respects just and reasonable” (Public Service Law, former § 26) and, that a railroad “shall start and run its cars *** at regular times * * * and shall furnish sufficient accommodations for the transportation of all passengers” (Railroad Law, § 54).
Enactment of section 96 of the Transportation Law in 1970 merely highlighted the durability of the common-law standard recognized by the Court of Appeals a century earlier in Willis (supra). Thus, section 96 of the Transportation Law provides that every carrier “shall furnish * * * such service and facilities as shall be safe and adequate and in all respects just and reasonable”.
Accordingly, the court holds that the language of section 96 of the Transportation Law sets forth the standard of service to which a passenger is entitled — regardless of whether that standard be deemed common law or statutory. The application of such standard to the facts of any particular case is, of course, an accustomed task of courts and juries (see, e.g., Davis v New York Cent. R. R. Co., 163 Misc 710).
ii
APPLICABILITY OF STATUTORY AND COMMON-LAW STANDARDS TO CONRAIL
Conrail contends that it is exempt from the statutory standard of “just and reasonable” service because it operates the commuter lines under a contract with the Metropolitan Transportation Authority (MTA). This MTA connection is claimed to be dispositive on two separate grounds: first, on the theory that the Transportation Law (and its predecessors) does not apply to MTA because MTA, being a public benefit corporation performing an “essential governmental function” (Public Authorities Law, §§ 1263, 1264), is neither a “[rjailroad company” nor a “[c]ommon carrier” as those terms are defined by subdivisions 6 and 7 of section 2 of the Transportation Law; second, because subdivision 8 of section 1266 of the Public Authorities Law specifically exempts MTA from the regulatory authority, *931 under the Transportation Law, of the Department of Transportation (DOT) and its predecessor, the Public Service Commission (Long Is. R.R. Co. v Public Serv. Comm. of State of N.Y., 30 AD2d 409, affd 23 NY2d 852; Metropolitan Transp. Auth. v Village of Tuckahoe, 67 Misc 2d 895).
Conrail concludes therefore that the standard of performance due a passenger under the Transportation Law has no bearing on Conrail’s operations and that the sole lawful measures of its performance are its own tariff schedules which, paradoxically, were filed under the self-same Transportation Law which Conrail claims to be irrelevant when relied upon by plaintiff.
The difficulties with Conrail’s position are several.
1. MTA, it is true, is a governmental agency and neither a “common carrier” nor a “railroad corporation” (Public Authorities Law, §§1263, 1264; Transportation Law, §2, subds 6, 7). Conrail, however, is not a governmental agency; it is — or at least was intended to be — a for-profit corporation; it is a common carrier; and it is subject to State regulation (US Code, tit 45, § 741, subd [b]; Transportation Law, §2, subd 7; §95).
Unlike MTA, then, Conrail is within the statutory definition of enterprises which are made subject to the Transportation Law and is not explicitly immunized by the Public Authorities Law from DOT regulation. Conrail’s immunity, if any, therefore must be found in the language of its contract with MTA and MTA’s broad authority in contracting, to do “all things it deems necessary, convenient or desirable, to manage, control and direct the maintenance and operation of transportation facilities, equipment and real property operated by or under contract, lease or other arrangement” (Public Authorities Law, § 1266, subd 8).
The MTA-Conrail “contract, lease or other arrangement”, however, never was offered at trial nor was any reference made to pertinent terms thereof. Hence, on this record, there is no basis for finding that Conrail shares MTA’s claimed immunity from the standards and regulations generally applicable to common carriers and railroad corporations in this State.
*932 2. Quite apart from the issue of whether Conrail shares MTA’s immunity from regulation by DOT under the Transportation Law, there remains the issue of whether Conrail is subject to the standards of performance imposed by the statute — and by common law.
The Transportation Law operates upon two distinct levels. On the one, DOT is empowered to regulate carriers and adopt administrative standards (e.g., Transportation Law, art 2); on the other, the Legislature, itself, has enacted its own standards and requirements. Those legislative standards, moreover, are self-executing as evidenced by section 111 of the Transportation Law, which specifically authorizes suit by any person damaged by a carrier’s failure “to do any act, matter or thing required to be done, either by law or by order of the commissioner” (emphasis added).
Accordingly, even if the exemption of subdivision 8 of section 1266 of the Public Authorities Law were applicable to Conrail, the immunity gained would extend only to those provisions of the Transportation Law empowering DOT to regulate the carrier; application to Conrail of the balance of the statute would remain unimpaired. By way of obvious example, DOT cannot exercise its power under section 99 of the Transportation Law, to review Conrail’s tariff schedules because subdivision 8 of section 1266 of the Public Authorities Law specifically exempts MTA from DOT’s regulatory authority. Nonetheless, Conrail continues to file those schedules with DOT in obedience to the legislative command to so do, contained in section 98 of the Transportation Law (indeed, as noted below, Conrail relies in this action upon the contents of those filed tariff schedules as a partial defense).
In sum, although the Public Authorities Law may authorize the overriding of DOT regulation, Conrail, a common carrier under both Federal and State law, remains subject to so much of the Transportation Law as constitutes self-executing legislative commands.
As noted earlier, one such command is the provision of section 96 that “Every corporation, person or common carrier * * * shall furnish * * * such service and facilities *933 as shall be safe and adequate and in all respects just and reasonable”. It is, moreover, a command enforceable at the suit of any person, in accordance with section 111.
Long Is. R. R. Co. v Public Serv. Comm. of State of N.Y. (supra) and Metropolitan Transp. Auth. v Village of Tuckahoe (supra) are entirely consistent with the conclusions set forth above. In those cases, the specific issues before the courts were whether the Public Service Commission, in one action, and a municipal building inspector, in the other, had jurisdiction over the decision of MTA to construct pedestrial footbridges and an overpass. The courts held that the commission (the predecessor of DOT) and the village lacked jurisdiction over these decisions because subdivision 8 of section 1266 of the Public Authorities Law specifically authorized MTA to override “local laws, resolutions, ordinances, rules and regulations of a municipality” and, that the PSC’s jurisdiction “shall not extend to [MTA] in the exercise of any of its powers”.
Both cases therefore dealt with specifically prohibited administrative efforts to regulate MTA’s operations. Nothing in this instant case, however, calls upon the court to regulate, oversee or interfere with MTA or Conrail’s operations. The issue simply put is whether or not Conrail performed its contract of carriage with plaintiff in accordance with statutory and common-law standards — and no rule of law has been called to the court’s attention which immunizes Conrail from its breaches of contract.
This case is similar to Warshak v Eastern Air Lines (191 Misc 503) where defendant claimed plaintiff’s action for breach of the carrier’s contract of carriage intruded upon the regulatory authority of the Civil Aeronautics Board. The court held (at p 504): “But this ignores the fact that the plaintiff has come into a common-law forum because of the alleged breach by a carrier of its contract to carry — a cause of action which time and again has been recognized as being within the jurisdiction of such a forum, in an action against a railroad company, for instance, not withstanding the similar provisions of the Interstate Commerce Act (US Code, tit. 49, § 1 et seq.) and the jurisdiction of the Interstate Commerce Commission (cf. Pennsylvania R.R. Co. v. Puritan Coal Mining Co., 237 U. S. 121; Hewitt v. *934 New York, N.H. & H.R.R. Co., 284 N. Y. 117). No questions of reasonableness of rates or validity of practices or of regulations is involved; the plaintiff takes the agreement he says he had with the defendant and charges the defendant with a breach”.
Nothing contained in this decision, of course, bars MTA from adopting regulations defining “adequate” “just and reasonable” performance. No such regulations, however, are before the court at this juncture. Thus, we leave for another day the question of MTA’s authority to adopt as its “official” norm the deplorable standards of service upon which the uncontradicted testimony focused herein.
hi
THE TRIAL TESTIMONY AND CONRAIL’S TARIFF SCHEDULES
The plaintiff maintained and submitted in evidence a log of his daily vicissitudes on Conrail’s Harlem line during January and February, 1981. We need not dwell at length upon his detailed, documented and depressingly familiar recital of the railroad’s performance record during that period. The persistent and lengthy delays, lack of heating in subfreezing weather, filth, overcrowding and noxious odors within vintage coaches to which he testified all have been the subject of previous judicial comment (Kessel v Long Is. R.R. Co., 107 Misc 2d 1067; Javeline v Long Is. R.R., 106 Misc 2d 814) and are so notorious as to be a matter of common knowledge. (Conrail rested at the close of plaintiff’s case maintaining that its sole obligation was to transport passengers from their point of origin to point of destination with the conditions of such transportation being absolutely immaterial.)
It is clear that the railroad is not a guarantor of its schedules (Gerardy v Louisville & Nashville R. R. Co., 52 Misc 466) and that such matters as overcrowding are but factors to be considered in evaluating performance (Schmidt v Interborough R.T. System, 49 Misc 255). Nonetheless, conditions of carriage necessarily are material to any determination of the carriers’ compliance with the standards set forth above. Were the law otherwise, Conrail could claim performance with the dispatch over its rails of horse-drawn open flatcars in the dead of winter. The defense fails therefore as a matter of common sense.
*935 Conrail further defends on the ground that its tariff schedules specifically provide that the sale of a ticket “includes no assurance of a seat on any particular train” (rule 2 [g]) and that the company does not “assume responsibility for inconvenience, expense or damage resulting from errors in timetable, cancelled or delayed trains” (rule 2 [h]).
It is immediately apparent that the tariff schedule is silent and therefore provides no defense to plaintiff’s claims based on unreasonable filth, noxious odors, failure to provide heating and discomfort resulting from excessive crowding (though plaintiff himself may be seated).
The court concludes therefore that plaintiff has sustained his burden of proof on the issue of Conrail’s failure to perform its contract in accordance with the standard imposed by law and that Conrail’s defenses are legally insufficient.
IV
THE MEASURE OF PLAINTIFF’S DAMAGES
It is well settled that a passenger may recover damages for the discomfort and inconvenience he suffers as a result of a carrier’s breach of contract (Campbell v Pullman Co., 182 App Div 931; Aplington v Pullman Co., 110 App Div 250; Davis v New York Cent. R.R. Co., 163 Misc 710 [App Term]; Owens v Italia Societa Per Azione Navigazione-Genova, 70 Misc 2d 719; see, too, Transportation Law, § 111). Moreover, the amount of damages need not be nominal, only (Campbell v Pullman Co., supra) nor need they be limited to the amount of the fare paid (Lignante v Panama R. R. Co., 147 App Div 97). However, in the absence of special damages or aggravating or unusual circumstances, damages ordinarily will be limited to “so much or all of the passage money necessary for rendition of exact justice” (Owens v Italia Societa Per Azione Navigazione-Genova, supra, p 723; Valencia, 110 F 221).
In measuring plaintiff’s damages the court is mindful of the absence of the usual “market” or “replacement” value evidence customarily utilized in contract cases but generally unavailable in a contract of this nature. Nonetheless, it is an ancient rule of law that where a contract is made to *936 “confer a particular enjoyment, the breach, so far as it disappoints in respect of that purpose, may give a right to damages appropriate to the objects of the contract” (1 Sutherland, Damages [1882 ed], pp 157-158). As the Court of Appeals observed in Park West Mgt. Corp. v Mitchell (47 NY2d 316, 329): “Problematical in these cases is the method of ascertaining damages occasioned by [defendant’s] breach. That damages are not susceptible to precise determination does not insulate [defendant] from liability”.
Here, the “objects of the contract” (1 Sutherland, Damages [1882 ed], p 158) were, as a matter of law, passage under safe, proper, reasonable and just conditions, commensurate with the cost of plaintiff’s commutation ticket. While plaintiff is not entitled to luxury class passage, neither should he be relegated to steerage.
The ascertainment of damages therefore must be based upon proof of the severity, frequency and specific nature of Conrail’s failures, the circumstances giving rise to them, the existence and effectiveness of measures taken to abate the failures, and the impact of these particular failures upon the rider of ordinary sensibilities. Of course, no single ride can be determinative; Conrail’s performance and plaintiff’s damages must be viewed over the entire period covered by plaintiff’s commutation ticket.
So measured, the court finds plaintiff’s damages are $13.80 representing 10% of the cost of his January and February, 1981 commutation tickets.